Matter of Anesia E. (2004 NY Slip Op 50736(U))

[*1]

Matter of Anesia E.

2004 NY Slip Op 50736(U)

Decided on July 9, 2004

Family Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 9, 2004

Family Court, Kings County
In the Matter of Anesia E. A Child under Eighteen Years of Age Alleged to be Abused by Antoinette W., Respondent.
NA 03877/02

Ian Sangenito, Esq., for petitioner
Division of Legal Services,
Administration for Children's Services
345 Adams Street, 8th Floor
Brooklyn, New York 11201
Thomas Whittig, Esq., law guardian
Juvenile Rights Division of the Legal Aid Society
111 Livingston Street, 8th Floor
Brooklyn, New York 11201
Libby Fee, Esq., for mother
26 Court Street, Suite 2503
Brooklyn, New York 11242

Bryanne A. Hamill, J.
In this child protective proceeding, the Administration for Children's Services ("ACS") filed a petition, pursuant to Article 10 of the Family Court Act, charging Antoinette W. ("mother") with abuse of her 14-month-old daughter, Anesia.
The lengthy petition alleges, inter alia, that "mother reports that the 14-month-old child suffers from seizures twice per week. However, there is no medical evidence that the subject child has ever suffered a true seizure or suffers from a seizure disorder. The mother has taken the subject child to the emergency room on at least fourteen occasions, five of which resulted in hospitalization. As a result, the subject child Anesia was subjected to numerous and potentially harmful medical procedures and treatments. Anesia has undergone blood tests, CAT scans, electroencephalograms ("EEG") and started on prescription drugs, including Phenobarbital and Zantac."
The petition further alleges that "on or about February 13, 2002, Anesia was monitored by a video EEG while hospitalized at Long Island Jewish Hospital. The following day, mother reported to medical personnel that the subject child suffered seizures during the night. However, the video EEG indicated that the child had not suffered any seizures. On February 13, 2002, medical personnel informed the mother that Anesia was a healthy child who did not suffer from seizures and that subjecting the child to unnecessary medical treatment was potentially dangerous to the child. The mother insisted that the child suffered seizures and stated that the mother would take the subject child to another hospital when discharged. The mother also reported to medical personnel that she had four previous children who died from seizures at early ages. She reported that two twin boys died in 1999 at Kings County Hospital at the age of eight months, that a five-month-old female child died at Downstate Hospital in 2000; and that at that same time, she was also pregnant with another child who died at seven months of age. The mother has also reported that she had three induced abortions because she feared that the unborn children would be sick."
This written decision follows this Court's oral decision rendered on July 3, 2003, at the conclusion of a protracted fact-finding, during which eleven witnesses testified. ACS called its caseworker, Miguel Ramon; Cheryl Terossy, M.D., a second-year pediatric resident at Schneider Children's Hospital; Gloria E., Anesia's paternal grandmother; Debra Esernio- Jenssen, M.D., Director of the Child Protection Center at Schneider Children's Hospital and one of Anesia's treating physicians; and Myles S. Schneider, M.D., a forensic psychiatrist.
In her defense, the mother called Simeone David, M.D., a forensic consultant with the Jewish Childcare Association of New York; N.G. Berrill, Ph.D., a licensed psychologist with the New York Center for Neuropsychology & Forensic Behavioral Science, P.C.; Ms. Sinclaire, the child's early intervention education therapist; Mr. Balou, the child's early intervention physical therapist; Rhonda W., Anesia's maternal aunt; and Brandon E., the non-respondent father. Notably, the mother failed to testify.
Extensive documents were introduced into evidence, including Anesia's and her mother's medical records, from, among others, Brooklyn Hospital, Maimonides Medical Center, Long Island Jewish Medical Center, Long Island College Hospital, Kings County Hospital, Schneider Children's Hospital, the Lamm Institute, as well as Anesia's early intervention records.
This Court's factual and legal determinations rely, to a great extent, upon expert testimony and records. With respect to the pediatric experts' testimony, this Court places the most weight [*2]on the testimony of Anesia's two treating pediatricians, Drs. Terossy and Esernio-Jenssen, who also observed and spoke to the mother. This Court places less weight on the testimony of Dr. David, who did not personally evaluate or treat Anesia. With respect to the psychological and psychiatric testimony, this Court places more weight on Dr. Schneider's testimony than Dr. Berrill's, based upon Dr. Schneider's confident and consistent opinions, as well as his thorough review of, and familiarity with, the records and testimony. In contrast, Dr. Berrill, who did not treat the mother but only evaluated her for purposes of the instant litigation, was unfamiliar with the records, only vaguely remembered the mother's statements made during interviews which he took at face value without speaking to collateral sources, and wavered in his opinions.
This Court draws an adverse inference against the mother for her failure to testify.
Findings of Fact and Discussion of the Expert Testimony
On February 11, 2002, Anesia, fourteen months of age, was admitted to Schneider Children's Hospital, after her mother reported that she suffered from severe seizures twice in one week.
On February 12, 2002, Dr. Cheryl Terossy, a second-year pediatric resident, spoke to the mother to gather the family's medical history. The mother told her that since Anesia's birth, she had taken Anesia to the hospital fourteen times due to seizures. The mother claimed that several of her children had died from seizures, including eight-month old twins who died in 1999, a five-month old daughter who died in 2000, and a child, Irene, who died shortly thereafter at seven months of age. She further claimed that she had three abortions, fearing that these births would produce children who would suffer seizure disorders.
Upon receiving this information, Dr. Terossy contacted Dr. Samuel Apitou, Anesia's neurologist, who was unaware of this purported medical history. Concerned Anesia's seizure history may be fabricated, Dr. Terossy notified Dr. Esernio-Jenssen, a well known child abuse expert.[FN1]
Shortly thereafter, Dr. Esernio-Jenssen spoke with the mother, who reported that Anesia was born full term by a vacuum and forceps delivery and suffered her first seizure at around nine [*3]days old. However, she claimed that "four babies had died inside of her," and she had "killed the others herself." She said that she herself suffers from seizures, enabling her to recognize Anesia's seizure disorder, and that the last time she experienced a seizure had been in 1997, while pregnant with Anesia.
Dr. Esernio-Jenssen opined, with a reasonable degree of medical certainty based upon her education, training, and experience, that (1) Anesia is a victim of Munchausen's syndrome by proxy ("MSP"), now called "medical child abuse" in the pediatric community; and (2) if left in her mother's care, Anesia would be at substantial risk for great physical harm. She based her opinion upon various factors and considerations. She concluded that Anesia does not actually suffer from seizures. When doctors at Schneider Children's Hospital discontinued Anesia's high doses of powerful anticonvulsant medications during a three day inpatient stay, medical personnel witnessed no seizures and the video EEG documented no seizure activity.[FN2] CAT scans and all other tests were normal. The referring pediatric neurologist as well as Schneider Children's Hospital's medical staff found Anesia to be healthy. However, during this hospital stay, the mother verbally reported and even pushed the video EEG button to record alleged seizures.
Further, when Dr. Esernio-Jenssen explained to Anesia's mother that Anesia was perfectly healthy and normal, she became very angry and sought to take her child to another hospital. Hospital personnel had to place a hold on Anesia, during which time ACS removed her from her mother and filed the instant petition. Anesia was discharged as a healthy toddler to her paternal grandmother, where she has resided since her removal from her mother, with no seizures.
With respect to Anesia's development, her mother claimed she was unable to perform age appropriate activities, such as follow commands and scribble. Dr. Esernio-Jenssen found otherwise.
Prior to this hospitalization, the mother had reported that Anesia repeatedly suffered generalized seizures, with foaming mouth, rolling eyes, and jerking extremities. However, no routine drowsiness or semi-consciousness, known as the postdictal state after a generalized seizure, was present after such alleged seizures. When ambulances responded, Anesia was routinely alert and happy. No medical personnel ever witnessed any seizures, and all tests performed, subsequent to her first EEG when she was just days old, produced normal results.
Dr. Esernio-Jenssen further opined that the mother's insistence to the medical community that Anesia was suffering from a seizure disorder unnecessarily caused Anesia to be repeatedly hospitalized, to undergo multiple tests and procedures, and to take powerful anticonvulsants by various methods of administration. This created a substantial risk of physical injury to Anesia. Lumbar punctures may result in infection and apnea and, later in life, growths. CAT scans, along [*4]with their inherent radiation risks, also present potentially fatal complications from sedation. Cognitive impairment results in about one-quarter of children who take Phenobarbital. When administrated intravenously, drowsiness or hyperactivity, as well as a skin condition called Stephen Johnson, can result. The morbidity rate for children diagnosed with MSP is 9% to 33%, with many deaths, and permanent disfigurement or disabilities up to 8%.
According to Dr. Esernio-Jenssen, the pediatric community is changing the child victim's diagnosis from MSP to medical child abuse in order to shift the emphasis away from the perpetrator and place it on the abused child, disregarding the psychological motivation or emotional state of the parent. The less stringent diagnostic criteria used by the pediatric community in making the diagnosis of medical child abuse differs from, and thus, warrants using a different name from, the psychiatric community's diagnostic criteria for MSP, known as factitious disorder by proxy in the Diagnostic and Statistical Manual "DSM" (4th edition). According to Dr. Esernio-Jenssen, the factors commonly found in case histories of parents, usually mothers, diagnosed with MSP include: (1) the child's prolonged illness, presenting confusing symptoms defying diagnosis and unresponsive to medical treatment; (2) the child's recurring hospitalizations, surgeries, and other invasive procedures; (3) the child's dramatic improvement after removal from parent's access and care; (4) the mother's training in nursing or related medical fields; (5) the mother's unusually supportive and cooperative attitude toward medical personnel; and (7) the mother's symbiotic relationship to the child.
ACS's forensic psychiatrist, Dr. Myles Schneider, corroborated Dr. Esernio-Jenssen's opinions, by opining that the mother intentionally fabricated seizures in Anesia, based
upon his review of the records as well as Dr. Esernio-Jenssen's testimony.[FN3] In addition to the medical records that demonstrate Anesia has not suffered seizures, Anesia's early intervention records reveal that her mother intentionally misinformed the program's personnel that Anesia needed an imminent liver transplant and suffered from left-sided paralysis. In fact, the mother intentionally misinformed the medical community about herself by claiming she had suffered from lead poisoning as well as memory loss related to a mild heart attack.
Dr. Schneider opined that the mother suffers from either the mental disorder commonly called MSP, also known as factitious disorder by proxy; or malingering by proxy, a mental condition in which the patient fabricates illness in others for economic gain. Both types of patients usually are mothers, with uninvolved, but perhaps collaborating, fathers. The most distinguishing feature is the motive for the fabrication or induction of illness. However, absent an [*5]interview and further assessment, Dr. Schneider could not establish whether the mother's motivation was to gain sympathy by assuming the sick role indirectly through the child, typical of MSP, or rather financial, typical of malingering. In the instant case, the mother has financially benefited since Anesia was less than two months old, by applying for and receiving monthly social security disability payments for Anesia's alleged seizure disorder.
Dr. Schneider explained that patients with MSP commonly have considerable experience in health related areas and thrive in a medical environment. Here, the mother, who has been seen in a white uniform, claims to study nursing, and is quite familiar with medical terminology, procedures, and environments. When confronted by health care providers, MSP patients typically become angry, as in this mother's response to Dr. Esernio-Jenssen when she was informed Anesia was healthy. MSP patients may make extraordinary false statements, such as Anesia's mother claiming Anesia needs a liver transplant and that four to six of her other children have died from seizures. None of which is true.
ACS's expert testimony was somewhat corroborated by the mother's psychological expert, Dr. N.G. Berrill.[FN4] He initially opined that the mother did not fabricate Anesia's seizures. He diagnosed the mother with depression, but pursuant to rigorous examination, he admitted that he could not rule out that she suffered from a formal thought disorder or a fixed delusion. Dr. Berrill ultimately conceded that Anesia was at risk of harm in her mother's care, absent outside structure and support. He based his opinions upon his three interviews with Anesia's mother, including a mental status exam, psychological testing, and review of only some of the records. His intelligence testing placed her functioning in the mildly impaired range, with a full scale IQ of 58, a performance IQ of 59, and a verbal IQ of 64.
ACS's expert testimony was, to some extent, further corroborated by the mother's child abuse expert, Dr. Simeone David.[FN5] He opined that Anesia did not actually suffer seizures, based upon review of the records and Dr. Esernio-Jenssen's testimony, despite some abnormal test results when Anesia was very young. However, he claimed that the mother's cognitive impairment may explain her gross inaccuracies, i.e. deaths of children by seizures, and perhaps misunderstandings.
For purposes of publication, this Court omits further discussion of testimonial evidence.
Analysis
After having carefully reviewed the extensive testimonial and documentary evidence, made the necessary credibility determinations, considered the relevant statutes, case law, and [*6]summations, this Court finds that the Administration for Children's Services has substantially established the allegations contained within their petition, as amended and conformed to the proof, by the required preponderance of the credible evidence.
The issue presented is whether such facts establish child abuse under New York law. The relevant sections of New York's Family Court Act §1012 (e) defines an abused child as a "child less than 18 years of age whose parent or other person legally responsible for the child's care either (i) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or (ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ." (emphasis added) FCA §§1012 (e)(i) & (ii). The major distinction between the two types of physical abuse is whether the child actually suffers the physical injury, defined in Penal Law §10.00(9) as substantial pain or the impairment of physical condition, which causes or creates a substantial risk of serious physical injury, as defined in Penal Law §10.00(10). For an abuse finding without physical injury actually caused, courts have found that protracted impairment of emotional health or a substantial risk thereof may be sufficient." See, Matter of Shane T., 115 Misc2d 161, 163 (Richmond Co. Fam.Ct., 1982); Matter of Shanaye C., NYLJ, 2/26/04, page 19, col. 1, 2003 NY Slip Op 23976, (Kings Co. Fam. Ct. 2003).
As a lesser charge of neglect, the relevant sections of the Family Court Act defines a neglected child as a "child less than 18 years old whose physical, mental or emotional condition has been impaired, or is in imminent danger of becoming impaired, as a result of the failure of the child's parent or other person legally responsible for the child's care, to exercise a minimum degree of care (B) in providing the child with supervision and guardianship, . . . by unreasonably inflicting, or allowing to be inflicted on the child harm or a substantial risk thereof . . . '' FCA §1012 (f)(i)(B). "The minimum degree of care standard establishes a minimum baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet. Under such standard, parental behavior [is] evaluated objectively [according to] whether a reasonable and prudent parent would have so acted . . . As such, a parent must exercise this minimum degree of care so as not to pose a risk of impairment to the child or place the child in imminent danger of impairment." (internal quotes omitted, internal cites omitted) In re Jessica YY, 258 AD2d 743, 744 (3rd Dept., 1999).
 With respect to the medical child abuse or MSP case law, it appears that generally when symptoms were fabricated, the Department of Social Services only charged neglect, not abuse. See, Matter of C. Children, 249 AD2d 540 (2nd Dept., 1998) (neglect charged and found where mother suffering from MSP fabricated symptoms of apnea in an infant); Matter of Suffolk County Dept. of Social Services on behalf of Aaron S., 215 AD2d 395 (2nd Dept., 1995) (neglect charged and found where mother suffering from MSP fabricated symptoms of apnea in eight-year-old son). However, the social services agency charged and the court found abuse when a mother suffering from MSP induced severe diarrhea in her child by giving laxatives. Matter of Jessica Z., 135 Misc2d 520 (Westchester Co. Fam. Ct., 1987).
[*7]
In the instant case, the mother argues that if this Court were to credit ACS's case, it must find her conduct neglectful, at most, because she only fabricated, not caused, illness in Anesia. This Court finds this argument unavailing because the determination with respect to whether this mother's conduct rises to the level of abuse is not whether the mother fabricated versus actually caused Anesia's illness, but rather is determined by the degree of risk she created to Anesia's health. Compare, FCA § 1012 (e)(i)(ii) with §1012 (f)(i)(B). "It is the actual or potential impact on the child, as opposed to the per se seriousness of the injury, that forms the predicate for abuse." Matter of Shane T., 115 Misc2d 161, 163 (Richmond Co. Fam Ct., 1982).
Pursuant to the first prong of the child abuse statute, this Court does not find Anesia suffered any actual physical injury. Thus, absent this proof, this Court finds ACS has failed to establish abuse, pursuant to FCA §1012(e)(i), by a preponderance of the credible evidence.
However, this Court does find that Anesia's mother's affirmative and intentional acts of repeatedly bringing her infant and then toddler to multiple hospitals and doctors, repeatedly claiming that Anesia suffered from repeated and severe seizures for more than a year, created and allowed to be created by the medical community, a substantial risk of physical injury leading to serious physical injury to Anesia. The repeated hospitalizations, medical testing, and administration of high doses of potent anticonvulsants posed substantial health risks for Anesia. Being considered and treated as a sick infant and toddler posed a substantial risk of protracted emotional harm as well. Moreover, the mother's extraordinary false statements that she actually killed children as well as had six children die from seizures, combined with her attempts to remove Anesia from Schneider Children's Hospital, demonstrate her increasingly dangerous desperation to convince the medical community that Anesia is sick.
The Family Court Act §1012 (e)(ii) authorizes the Court to enter findings of abuse when a parent's future behavior will be sufficiently harmful to the child to justify a finding of abuse and state intervention. See, Besharov's Commentaries, McKinney's Cons Laws of NY, Book 29A, Part 1, Family Court Act §1012, 1999. Inasmuch as there are substantial risks with each hospitalization and test performed, there is a high risk of cognitive impairment from anticonvulsant therapy, and Anesia's treating child abuse pediatrician finds her to be at "substantial risk for great physical harm in her mother's care," this Court finds that the totality of the circumstances herein warrant a finding of abuse. Further, this Court holds that Anesia's mother creates and allows to be created a substantial risk of physical injury to Anesia, which would likely cause this toddler to suffer, at a minimum, protracted emotional impairment.
Despite no supporting authority, the mother argues that her actions and extraordinary statements are accidental, relieving her of civil liability, based upon her cognitive and psychological impairment. This Court rejects this argument, which would essentially circumvent the legislative intent in protecting children in cases where parents suffering from mental disorders or cognitive impairment abuse their children. No specific intent to injure or specific motive is necessary for a finding of abuse. And "good faith, good intentions and even best efforts, are not, per se, defenses to a child protective petition." Aaron S., supra at 395, citing Matter of Katharine C., 122 Misc2d 276, 278 (N.Y. Fam. Ct., 1984).
In conclusion, based upon the foregoing reasons, this Court finds Anesia to be an abused child, pursuant to Family Court Act §1012 (e)(ii). Furthermore, based upon her own psychological expert's opinion that Anesia would be at risk by virtue of her mother's cognitive [*8]and psychological impairment, this Court also finds Anesia to be a neglected child, pursuant to Family Court Act §1012 (f)(i)(B).
Contrary to counsels' arguments, for purposes of the fact-finding, this Court need not, and should not, determine the mother's psychological forces at play. The experts have testified to various mental disorders and conditions which could account for the mother's actions and extraordinary statements. These include Munchausen's syndrome by proxy, known as factitious disorder by proxy; a formal thought disorder; a major depression; a fixed delusional system; and malingering by proxy.
However, for purposes of disposition, the mother shall undergo a comprehensive psychosocial, psychological, and psychiatric evaluation, which shall specifically address her diagnosis and prognosis, treatment recommendations, her insight and motivation for treatment, and Anesia's safety in her care.
The foregoing constitutes the decision and order of this Court.
__________________________
BRYANNE A. HAMILL, J.F.C.
Footnotes

Footnote 1: Dr. Debra Esernio-Jenssen is currently employed in the Division of General Pediatrics at Schneider Children's Hospital in New Hyde Park. She is also an Associate Professor of Clinical Pediatrics at Albert Einstein College of Medicine; the Director of the Child Protection Center at the Albert Einstein College of Medicine; Chairperson of the Child Protection Consultation Team at Schneider Children's Hospital for the past four years; and Director of the Child Abuse Team at North Shore University Hospital. She has published papers and lectured nationally and internationally on child abuse and neglect. She has testified as a child abuse expert over 50 times. With respect to Munchausen's syndrome by proxy ("MSP"), she has participated in workshops, published a case review, and been directly involved in MSP cases wherein one mother admitted to killing her child, and another fabricated her child's repeated urinary tract infections. New York courts have repeatedly qualified her as a child abuse expert, and have permitted her to testify about MSP. In the instant case, Dr. Jenssen is declared an expert in pediatric medicine, child abuse and neglect, and pediatric MSP.

Footnote 2: A video EEG, an electroencephalogram, is a continuous mono train of electrical impulses in the brain. The caregiver has the opportunity to press a push button attachment when observing what they perceive to be a seizure. These push button events should correlate with a visible seizure and seizure activity on the EEG. The video EEG is generally accepted in the pediatric community for evaluation of seizure disorders.

Footnote 3: Dr. Myles Schneider is a psychiatrist certified by the American Board of Psychiatry and Neurology and by the American Board of Forensic Psychiatry. Dr. Schneider is qualified as an expert in the field of psychiatry as well as forensic psychiatry, the application of psychiatric expertise to legal issues. For the past twenty-three years, Dr. Schneider has been on the staff of the psychiatric clinic for the NY County Supreme Court, and evaluates criminal defendants for, inter alia, their fitness to stand trial. In instant case, Dr. Schneider reviewed voluminous records, including Kings County Hospital, Long Island College Hospital, St. Mary's Hospital, and the early intervention program.

Footnote 4: Dr. Berrill holds a Ph.D. in Clinical Psychology and is currently the director for the New York Center for Neuropsychology & Forensic Behavioral Science, P.C.

Footnote 5: Simeone David, M.D. is presently employed by the Jewish Childcare Association, a foster care agency. Previously, he was chairman of the child abuse committee at Beth Israel Medical Center. He has not personally evaluated Anesia, but he spoke with her mother.